**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 6, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JEROME DANIEL FOOTE,

Defendant-Appellant.

No. 03-3263

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 00-CR-20091-KHV)**

---

Terrence J. Campbell, Barber Emerson, L.C., Lawrence, Kansas, for Defendant-Appellant.

Scott C. Rask, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **PORFILIO**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

## I.    INTRODUCTION

Jerome Foote was convicted in United States District Court for the District of Kansas of trafficking in counterfeit goods and conspiring to traffic in counterfeit goods based on his sale of a single counterfeit Mont Blanc pen in violation of the Counterfeit Trademark Act, 18 U.S.C. § 2320, and 18 U.S.C. § 371.  He now appeals his convictions and sentence.  This court has jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms** Foote's convictions.  Because the district court applied the wrong version of the United States Sentencing Guidelines ("U.S.S.G."), however, this court **remands** the case for resentencing.

## II.   BACKGROUND

Foote was charged in the district court with forty-four counts of counterfeiting, conspiracy to counterfeit, money laundering, and engagement in an unlawful monetary transaction.  The indictment alleged that Foote had sewed or glued a variety of counterfeit trademarks onto goods such as purses, scarfs, watches, pens, shirts, and sunglasses, and then sold these products to the public.  Foote originally sold the goods from his residence in Lenexa, Kansas.  He openly advertised his business, which he called "Replicas," as offering high-quality reproductions of brand-name products.

FBI Special Agent Albert Pisterzi was one recipient of a mailing promoting Foote's business.  In response to the mailing, Pisterzi went to Foote's home and

observed that Foote was selling goods from which the original tags had been removed and replaced with tags bearing various famous trademarks. Two months later, Richard Smith, a private investigator employed by a firm representing trademark owners, went to Foote's home and determined that at least some of the goods sold by Foote were counterfeit. Foote told Smith during the visit that the items were the "best damn copies in the world that money could buy."

Foote later relocated Replicas from his home to a strip mall in Lenexa. Smith, along with FBI Special Agents Stanley Wright and Melissa Osborne, visited the store on November 22, 1998, and purchased $466 worth of merchandise that Smith determined was counterfeit. Among the items purchased was a pen with a counterfeit Mont Blanc trademark symbol. These purchases made Foote suspicious that he was under investigation, and by the end of the next day he had moved all the counterfeit merchandise out of the store.

Based on the purchased goods, Wright applied for and was granted a search warrant for Foote's store. In his supporting affidavit, however, Wright failed to reveal his knowledge that Foote had already removed all the counterfeit merchandise. After Wright determined that Foote had returned some of the goods to the store, he executed the warrant on December 7, 1998, and seized approximately 5200 items. Following a pretrial suppression hearing, the district court concluded that by omitting his knowledge that Foote had removed the

counterfeit goods, Wright had intentionally or recklessly omitted material information from his affidavit that would have negated probable cause. The court therefore granted Foote's motion to suppress all the evidence seized from the store pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The court did not, however, suppress evidence of goods that were purchased from the store by Smith or found in a consensual search of an employee's car.

The partial suppression of evidence resulted in the dismissal with prejudice of twenty of the counts against Foote that were based on trafficking in particular counterfeit trademarks for which all evidence had been suppressed. A jury convicted Foote of twenty-three of the remaining twenty-four counts, which involved charges of conspiracy, trafficking in goods for which the evidence was not suppressed by the district court, and related financial crimes. The district court then granted Foote's motion for judgment of acquittal with respect to twenty-one counts on the ground that the government had failed to present any evidence that the pertinent registered trademarks were actually in use at the time Foote trafficked in goods bearing those marks, as required by the Counterfeit Trademark Act, 18 U.S.C. § 2320(e)(1)(A)(ii). *See United States v. Guerra*, 293 F.3d 1279, 1290 (11th Cir. 2002). The court found, however, that the government had produced sufficient evidence that Mont Blanc's registered trademark was in use at the time Foote trafficked in the goods. The court therefore upheld the

jury's verdict on one count of trafficking in counterfeit goods and one count of conspiring to traffic in counterfeit goods based on the sale of a single counterfeit Mont Blanc pen that Smith had purchased from Foote's store.

At sentencing, the court considered additional evidence from the government that trademarks other than the Mont Blanc mark were also in use at the time Foote sold products bearing those marks. Based on this evidence, the court enhanced Foote's offense level to reflect the total estimated value of all the counterfeit goods sold from Foote's store. *See* U.S.S.G. § 2B5.3(b)(1) (May 1, 2000). The court sentenced Foote to thirty-seven months of imprisonment, three years of supervised release, and a fine of more than $104,000. Foote appeals his convictions and sentence.

## III. DISCUSSION

### A. The district court's "likelihood of confusion" instruction

Section 2320 provides criminal penalties for anyone who "intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." 18 U.S.C. § 2320(a). The statute defines a counterfeit mark as a spurious mark "the use of which is likely to cause confusion, to cause mistake, or to deceive." *Id.*

§ 2320(e)(1)(A)(iii).[1]  Over Foote's objection, the district court instructed the jury

on the "likely to cause confusion, to cause mistake, or to deceive" test as follows:

> Under [this] requirement, it does not matter that the specific persons who purchased the goods may not have been confused or deceived. The test is whether defendant's use of the mark was likely to cause confusion, mistake or deception to the public in general.  In this regard, you should determine whether an average consumer would be deceived into believing that the product was made by the genuine trademark owner.

---

[1]The full definition of "counterfeit mark" is:

(A) a spurious mark—
    (I) that is used in connection with trafficking in goods or services;
    (ii) that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
    (iii) the use of which is likely to cause confusion, to cause mistake, or to deceive; or
(B) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of the Lanham Act are made available by reason of section 220506 of title 36;

but such term does not include any mark or designation used in connection with goods or services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation . . . .

18 U.S.C. § 2320(e)(1).

Foote argues that this instruction allowed the jury to find him guilty even if none of his customers were likely to be confused, as long as the jury concluded that customers might use the goods in a way that would likely cause confusion in the public in general. He contends that he openly advertised that he sold counterfeit merchandise and that he informed each customer that his merchandise was fake. Because his customers were never fooled into thinking they were purchasing authentic merchandise, Foote argues that the criminal counterfeiting statute is inapplicable to his conduct. Foote objected to the district court's instruction and tendered an alternative instruction stating that "[a]ny use of the mark by others having only an arms-length relationship to this defendant (i.e. retail customers) should have no bearing on [the jury's] deliberations." The district court overruled Foote's objection.

This court reviews the district court's refusal to give a particular jury instruction for abuse of discretion. *United States v. Voss*, 82 F.3d 1521, 1529 (10th Cir. 1996). Whether the jury was properly instructed is a question of law that this court reviews *de novo*. *Id.* The district court's jury instruction was based on the law of "post-sale confusion." *See United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987). Courts that have applied the concept of post-sale confusion have held that the counterfeiting statute's "application is not restricted to instances in which direct purchasers are confused or deceived by the

-7-

counterfeit goods." *United States v. Yamin*, 868 F.2d 130, 132 (5th Cir. 1989).

Instead, these courts hold that the statute "is satisfied by a showing that it is

likely that members of the public would be confused, mistaken or deceived should

they encounter the allegedly counterfeit goods in a post-sale context."

*Torkington*, 812 F.2d at 1352. In *Torkington*, the Eleventh Circuit explained:

> Like the Lanham Act, the Trademark Counterfeiting Act is not
> simply an anti-consumer fraud statute. Rather, a central policy goal
> of the Act is to protect trademark holders' ability to use their marks
> to identify themselves to their customers and to link that identity to
> their reputations for quality goods and services.
>      It is essential to the Act's ability to serve this goal that the
> likely to confuse standard be interpreted to include post-sale
> confusion. A trademark holder's ability to use its mark to symbolize
> its reputation is harmed when potential purchasers of its goods see
> unauthentic goods and identify these goods with the trademark
> holder. This harm to trademark holders is no less serious when
> potential purchasers encounter these counterfeit goods in a post-sale
> context.

*Id.* at 1352-53 (citations and footnote omitted).

This court has not yet addressed the role of post-sale confusion under the

Counterfeit Trademark Act. The Second, Fifth, Eighth, and Eleventh Circuits,

however, have all concluded that the statute covers post-sale confusion. *United*

*States v. Hon*, 904 F.2d 803, 808 (2d Cir. 1990); *Yamin*, 868 F.2d at 132-33;

*United States v. Gantos*, 817 F.2d 41, 43 (8th Cir. 1987); *Torkington*, 812 F.2d at

1352. This court is persuaded by the reasoning of these courts and now joins

them in holding that the "likely to cause confusion, to cause mistake, or to

deceive" test is not limited to direct purchasers of the counterfeit products. Instead, the correct test is whether the defendant's use of the mark was likely to cause confusion, mistake, or deception in the public in general.

This conclusion is mandated by the plain language of the statute. Even in the context of post-sale confusion, it is still the defendant's use of the product in commerce (i.e., the sale of the counterfeit product) that is likely to cause confusion, mistake, or deception in the public in general (i.e., when the product comes into contact with third parties). As the Eleventh Circuit noted in *Torkington*, the statutory language is broadly worded, and "[n]othing in the plain meaning of the section restricts its scope to the use of marks that would be likely to cause direct purchasers of the goods to be confused, mistaken or deceived." *Torkington*, 812 F.2d at 1351.[2] The court's instruction to the jury was therefore a correct statement of the law, and the court did not err in refusing to give Foote's proposed alternative instruction. *See United States v. Grissom*, 44 F.3d 1507,

---

[2]In crafting the language of the Counterfeit Trademark Act, Congress had available to it language from an earlier version of the civil liability provisions of the Lanham Act, which required a showing that the infringer's use be "'likely to cause confusion, or to cause mistake, or to deceive *purchasers* as to the source of origin of such goods or services.'" *Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir. 1971) (emphasis added) (quoting 15 U.S.C. § 1114(1) (amended 1962)). The absence of similar clarifying language in the Counterfeit Trademark Act is further evidence that the statute covers confusion in the post-sale context.

1512 (10th Cir. 1995) (noting that a defendant is not entitled to a jury instruction that lacks a reasonable legal basis).

## B.    Trafficking in a single good

Count ten of the indictment charged Foote with "intentionally traffick[ing] and attempt[ing] to traffic in the following *good*: Mont Blanc Pen." (emphasis added).  Foote argues that the language of this count did not state a violation of § 2320, which prohibits "intentionally traffic[king] or attempt[ing] to traffic in *goods*."  18 U.S.C. § 2320(a) (emphasis added).  The statute's use of the plural word "goods," Foote contends, requires that a defendant traffic in more than one counterfeit good in order to violate the statute.

The first section of the United States Code provides that "unless the context indicates otherwise . . . words importing the plural include the singular." 1 U.S.C. § 1.  Under this provision, trafficking in a single counterfeit good constitutes trafficking in "goods" and is therefore a violation of the Counterfeit Trademark Act.  Nothing in the language or context of the statute mandates a different result.  Contrary to Foote's assertions, interpreting the statutory language in this way does not contravene Congress' intent to limit criminal penalties to the most egregious cases of trademark infringement.  Section 2320 is still far narrower than the civil liability provisions of the Lanham Act because it requires proof of criminal intent, and because it proscribes only the use of

counterfeit marks that are "identical with, or substantially indistinguishable from" a registered trademark. 18 U.S.C. § 2320(a), (e)(1)(A)(ii); *see Hon*, 904 F.2d at 805-06 (noting that the Lanham Act covers "reproduction[s]," "cop[ies]" and "colorable imitation[s]" of registered trademarks in addition to counterfeit marks). The district court therefore did not err in denying Foote's motion for judgment of acquittal on this ground.

### C. Statute of limitations

Section 2320 incorporates "[a]ll defenses, affirmative defenses, and limitations on remedies that would be applicable in an action under the Lanham Act." 18 U.S.C. § 2320(c). Although the Lanham Act does not contain an express limitations period, other circuits have held that claims under the Act are subject to the statute of limitations of the most analogous state-law cause of action from the state in which the claim is heard. *See, e.g.*, *Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 n.2 (9th Cir. 1991). Foote argues that Kansas' two-year statute of limitations for unfair competition claims is the most analogous state-law provision. Kan. Stat. Ann. § 60-513(a)(4). Because a civil trademark suit under the Lanham Act would have been barred by the Kansas statute of limitations at the time of his criminal prosecution, Foote argues that the plain language of § 2320 mandates that his conviction for trafficking in counterfeit

goods should also have been barred.[3]  Foote further contends that the conspiracy charge should have been precluded because no overt act in furtherance of the conspiracy was committed during the two-year limitations period. *See United States v. Hauck*, 980 F.2d 611, 613 (10th Cir. 1992) (noting that a conspiracy occurs within a limitations period when an overt act in furtherance of the conspiracy is committed within that period).

This court has not yet addressed the relevant statute of limitations under the Lanham Act, and need not do so here.  Unlike civil statutes such as the Lanham Act that are sometimes held to incorporate analogous state-law limitations periods, criminal provisions without express statutes of limitations are subject to a catchall limitations period of five years.  *See* 18 U.S.C. § 3282.  According to the criminal catchall provision, the five-year period applies "[e]xcept as otherwise *expressly* provided by law." *Id.* (emphasis added).  There is no such express statute of limitations in either the Counterfeit Trademark Act or the Lanham Act.  Although some courts have read the Lanham Act to incorporate analogous state statutes of limitations, these limitations periods arise only by implication and are not "expressly provided by law."  Courts read implied limitations periods into statutes only when Congress has failed to specify a contrary statutory period. *See*

---

[3]The evidence at trial indicated that Foote trafficked in the Mont Blanc pen on November 22, 1998.  The government does not dispute that the prosecution against Foote was not commenced until more than two years after this date.

*Trs. of the Wyo. Laborers Health & Welfare Plan v. Morgen & Oswood Constr. Co.*, 850 F.2d 613, 618 (10th Cir. 1988).  In the case of the Counterfeit Trademark Act, a criminal statute, Congress has provided a specific statutory period in § 3282.

Because there is no question that Foote's criminal conduct occurred within the five-year limitations period, the prosecution in this case was timely.

**D.    Sufficiency of the evidence**

In the district court, Foote moved for a judgment of acquittal because the prosecution had failed to submit evidence that the relevant trademarks were in use at the time Foote trafficked in goods bearing those marks.  The court granted the motion as to all counts except for the charges of trafficking in and conspiracy to traffic in a single counterfeit Mont Blanc pen.  As to those counts, the court concluded that the government had presented sufficient evidence for a jury to conclude that the Mont Blanc trademark was in use at the time Foote sold a pen bearing that mark to Richard Smith on November 22, 1998.  A district court's decision to deny a motion for judgment of acquittal is reviewed *de novo*.  *United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir. 2000).  Viewing the evidence in a light most favorable to the government, this court must determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  *Id.*

At trial, the government introduced a certified copy of the registration for the Mont Blanc trademark, which indicated that Mont Blanc began using the mark on pens in 1913 and registered the mark in 1967. Foote correctly argues that this evidence standing alone would have been insufficient to demonstrate that the trademark was in use at the time Foote sold the pen bearing the mark in 1998. *See Guerra*, 293 F.3d at 1290. The counterfeiting statute requires not only that the genuine mark be federally registered, but also that the mark be in actual use at the time of the defendant's use of that mark. *See* 18 U.S.C. § 2320(e)(1)(A)(ii) (requiring the mark to be "identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office *and in use*" (emphasis added)); *Guerra*, 293 F.3d at 1290.

The prosecution presented additional evidence, however, in the form of the testimony of Joyce Workman, Mont Blanc's vice-president of customer services. Workman testified that the company produced writing instruments from "way back" and that the Mont Blanc trademark "appears on every single Mont Blanc product that Mont Blanc makes." When combined with the evidence of trademark registration and first use, this evidence was sufficient for a jury to reasonably infer that Mont Blanc had been producing pens continuously since 1913. A jury could further have reasonably concluded that the trademark appeared on every pen

the company produced since that time. The district court therefore did not err in concluding that there was sufficient evidence in support of Foote's convictions for trafficking and conspiracy to traffic in counterfeit Mont Blanc pens.

### E. Sentencing

#### 1. Guidelines version

In determining Foote's sentence, the district court applied the version of the United States Sentencing Guidelines Manual that became effective on May 1, 2000.[4] Foote objected to the court's use of this version of the Guidelines, arguing that the November 1998 version instead should instead have been applied.

The Guidelines specify that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). There is an exception to this rule, however, for cases when "the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution." *Id.* § 1B1.11(b)(1). "The Ex Post Facto Clause is violated if the court applies a guideline to an event occurring before its enactment, and the application of that

---

[4]The May 2000 Guidelines consist of an emergency amendment to the sentencing provision for criminal infringement of copyright or trademark, U.S.S.G. § 2B5.3, to be used in conjunction with the remainder of the 1998 Guidelines manual. Other than § 2B5.3, the two versions of the Guidelines are therefore identical. All references to the Guidelines hereinafter refer to the 1998 version unless specified to the contrary.

guideline disadvantages the defendant by altering the definition of criminal conduct or increasing the punishment for the crime." *United States v. Sullivan*, 255 F.3d 1256, 1259 (10th Cir. 2001) (quotation omitted). In such a case, the court is instead required to "use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1).

The parties agree that the version of the Guidelines in effect at the time of sentencing would have resulted in a higher sentence than the Guidelines in effect at the time Foote's offense was committed. The district court therefore applied the May 2000 version of the Guidelines based on its finding that the conspiracy alleged in count one of the indictment continued until at least May 18, 2000.[5] Foote argued in the district court and maintains on appeal that the conspiracy actually terminated on December 7, 1998, which was the date when the government seized all the merchandise from his store. Based on this date, the

---

[5]The Guidelines specify that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3). This is true "even if the revised edition results in an increased penalty for the first offense." *Id.* § 1B1.11, cmt. background. This court in *United States v. Sullivan* held that this "one-book rule" does not violate the Ex Post Facto Clause. 255 F.3d 1256, 1261-63 (10th Cir. 2001). Accordingly, the district court was required to apply the Guidelines in effect on the last date of any of Foote's offenses of conviction, which in this case was the conspiracy offense. The effective date of the offense of conspiracy is the date when the conspiracy is terminated. *United States v. Stanberry*, 963 F.2d 1323, 1327 (10th Cir. 1992).

November 1998 version of the Guidelines would instead have been the applicable version, and Foote's base offense level would have been two levels lower than the level specified by the May 2000 Guidelines. This court agrees that the conspiracy terminated in 1998 and that the district court therefore erred in applying the 2000 version of the Guidelines.

The district court's conclusion that the conspiracy continued until at least May 18, 2000, was based on its findings by a preponderance of the evidence that Foote continued selling counterfeit goods even after the FBI seizure in 1998. The court relied for its finding on the testimony of Brandon Smith, an employee of Foote's. Brandon Smith testified that Foote continued to sell items similar to those seized by the FBI, including products with Nike, Tommy Hilfiger, and Dooney & Bourke trademarks, until May 18, 2000. The district court had previously held, however, that there was insufficient evidence presented at trial on which a jury could conclude that the Nike, Tommy Hilfiger, Dooney & Bourke, or any other trademarks other than the Mont Blanc mark were in use at the time Foote trafficked in goods with those marks. *See Guerra*, 293 F.3d at 1290 (noting that the Counterfeit Trademark Act requires the relevant trademarks to be in actual use at the time of the defendant's conduct). Because the government failed to prove that Foote engaged in illegal trafficking of these goods, it also necessarily failed to prove that Foote engaged in an illegal

conspiracy when he conspired to sell them. *See United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996) (noting that, in order to establish conspiracy, the government must prove that the agreed-upon conduct included all elements of the underlying substantive crime); *United States v. Hanson*, 41 F.3d 580, 582 (10th Cir. 1994) ("[T]he essence of any conspiracy is the agreement or confederation to commit a crime." (quotation omitted)). A conspiracy to sell goods with trademarks that are not in use is not a crime. *See Guerra*, 293 F.3d at 1290.

The only trademark that the government proved was in use at the time of Foote's conduct was the Mont Blanc mark, and the only criminal conspiracy for which Foote could have been convicted was therefore conspiracy to sell products with counterfeit Mont Blanc trademarks. Both Brandon Smith and Foote denied, and there was no other evidence presented, that Foote sold any items with the Mont Blanc trademark after the FBI seized all the goods from his store on December 7, 1998. The uncontradicted evidence therefore established that the conspiracy to sell counterfeit Mont Blanc pens terminated on that date. *See Grunewald v. United States*, 353 U.S. 391, 397 (1957) (noting that the duration of a conspiracy is determined by the scope of the conspiracy).[6] To the extent the

_____

[6]This is true even though the indictment alleged that the conspiratorial agreement continued until approximately October 2000, because the conspiracy alleged in the indictment encompassed Foote's sale of a whole range of counterfeit goods for which the government failed to prove the trademarks were

(continued...)

conspiracy count in the indictment included conspiracy to traffic in other goods, such a conspiracy was not supported by sufficient evidence.

The government nevertheless argues that the district court's application of the 2000 Guidelines was proper because of the court's finding by a preponderance of the evidence at sentencing that the other trademarks were in use at the time Foote trafficked in goods bearing those marks. Even though the district court was entitled to sentence based on relevant conduct found by a preponderance of the evidence, however, only the offense of conviction is relevant for purposes of the Ex Post Facto Clause. U.S.S.G. § 1B1.11, cmt. n.2. The Guidelines specify that:

> the last date of the offense of conviction is the controlling date for ex post facto purposes. For example, if the offense of conviction (i.e., the conduct charged in the count of the indictment or information of which the defendant was convicted) was determined by the court to have been committed between October 15, 1991 and October 28, 1991, the date of October 28, 1991 is the controlling date for ex post facto purposes. This is true even if the defendant's conduct relevant to the determination of the guideline range under §1B1.3 (Relevant Conduct) included an act that occurred on November 2, 1991 (after a revised Guideline Manual took effect).

*Id.*

---

[6](...continued)
actually in use. The evidence of trafficking in the Mont Blanc trademark did not support the existence of a conspiracy past December 7, 1998. Although the government contends that it needed only to prove an overt act in furtherance of the conspiracy within the relevant time period, it has not identified for this court any evidence of an overt act in support of the conspiracy to traffic in products bearing the Mont Blanc trademark after December 7, 1998.

It is clear from the district court's dismissal of all the substantive trafficking counts other than the count involving the counterfeit Mont Blanc pen that Foote's conspiracy conviction could only have encompassed conspiracy to traffic in counterfeit Mont Blanc products. The government has therefore failed to meet its burden of establishing that the conspiracy of conviction continued beyond the effective date of the May 2000 Guidelines. *See United States v. Harrison*, 942 F.2d 751, 760-61 (10th Cir. 1991) (holding that amended Guidelines could not be used to sentence a defendant on a conspiracy charge when there was insufficient evidence that the conspiracy continued beyond the effective date of the amended Guidelines). The district court's findings of related counterfeiting activities by a preponderance of the evidence is irrelevant to this conclusion. *See* U.S.S.G. § 1B1.11, cmt. n.2.

Because the district court improperly applied the Guidelines, Foote's sentence must be reversed and the case remanded for resentencing. *See United States v. Doe*, 398 F.3d 1254, 1257 n. 5 (10th Cir. 2005).[7]

2. *Infringement amount*

Although the district court may consider only the offense of conviction for purposes of selecting the proper version of the Guidelines, it may take into

---

[7]Given this resolution, this court need not address Foote's contention that his sentence violates *United States v. Blakely*, 124 S. Ct. 2531 (2004). *See United States v. Doe*, 398 F.3d 1254, 1257 n.5 (10th Cir. 2005).

account all relevant conduct in determining a sentence pursuant to the applicable Guidelines version. *See* U.S.S.G. § 1B1.3(a). The offense level for criminal counterfeiting under the 1998 version of the Guidelines is based on the retail value of the infringing goods, which the district court in this case determined to be the total retail value of all counterfeit items sold by Foote. *Id.* § 2B5.3(b)(1). Because an exact record of Foote's sales was not available, the district court calculated the retail value of the infringing goods by adding the value of the counterfeit goods seized by the government to the total value of Foote's bank account deposits and cashed checks during the relevant time period. The court then subtracted Foote's documented income from legitimate sources and reduced the resulting value by ten percent to reflect its determination that no more than that proportion of goods sold at Replicas constituted non-counterfeit merchandise.

Foote disputes the district court's methodology for calculating the infringement amount. He argues that the precise language of the Guidelines requires the court to calculate the infringement based on "the retail value of the infringing item, multiplied by the number of infringing items" rather than relying on the total value of bank account transactions. U.S.S.G. § 2B5.3, cmt. n.2(B) (May 1, 2000). The language cited by Foote, however, does not appear in the 1998 version of the Guidelines. *See id.* § 2B5.3. The 1998 version, which the district court should have applied in this case, requires only that the court

determine "the retail value of the infringing items." *Id.* District courts have "considerable leeway in assessing the retail value of the infringing items," and "need only make a reasonable estimate of the loss, given the available information." *United States v. Slater*, 348 F.3d 666, 670 (7th Cir. 2003) (quotation omitted). The district court's methodology is reviewed for clear error. *Id.* In the absence of more accurate information indicating the retail value of the counterfeit goods sold by Foote, the court's decision to include bank account transactions in its calculation did not constitute clear error.

In the alternative, Foote disputes the district court's method of calculating total bank transactions. He contends that the district court erred when it counted cashed checks toward this total, because the cash obtained from those transactions could have been deposited in other bank accounts and might therefore have been double-counted by the court. Foote also argues that the district court erred in including deposits to a joint bank account in the absence of evidence that he was the only one responsible for making deposits to that account. Although Foote raised these issues in the district court, the court did not explicitly address them. Without the benefit of an explanation of the district court's reasons for including these transactions, this court declines to consider Foote's contentions for the first time on appeal. *See R. Eric Peterson Constr. Co. v. Quintek, Inc.* (*In re R. Eric. Peterson Constr. Co.*), 951 F.2d 1175, 1182 (10th Cir. 1991) (noting that this

court generally does not consider issues not ruled on below). On remand, the district court will have the opportunity to address these issues in the first instance.

### 3. *Criminal fine*

Foote next argues that § 2320's incorporation of "[a]ll defenses, affirmative defenses, and limitations on remedies that would be applicable in an action under the Lanham Act" precludes imposition of a criminal fine in circumstances where damages would not be available as a remedy for civil trademark infringement. *See* 18 U.S.C. § 2320(c). Foote contends that civil damages would not be available in this case because there was no evidence that Mont Blanc gave notice that its mark was federally registered or that Foote had actual notice of the registration. *See* 15 U.S.C. § 1111 (providing that profits and damages are not available as civil remedies for trademark infringement unless the trademark registrant gives notice or the defendant has actual knowledge of the federal registration).

In *United States v. Sung*, the Seventh Circuit held that "[r]estitution in a criminal case is the counterpart to damages in civil litigation" and therefore that restitution could not be imposed in a criminal case where damages would not have been available under the Lanham Act. 51 F.3d 92, 94 (7th Cir. 1995). Even assuming that the Seventh Circuit is correct that criminal restitution is analogous to civil damages, the rationale of *Sung* would not extend to this case. The court's

conclusion in *Sung* was based on its reasoning that restitution is a form of money damages payable to the trademark owner. *See id.* Unlike restitution, fines are a form of criminal punishment rather than a form of damages, and are payable to the government rather than to the trademark owner. A criminal fine is therefore more analogous to other forms of criminal punishment such as imprisonment than to a civil damages remedy. Because the Lanham Act provides for no limitation on fines or other forms of criminal punishment, the Counterfeit Trademark Act's incorporation of all "limitations on remedies" has no relevance to the imposition of a criminal fine.[8]

Foote also contends that the district court's imposition of a fine of $104,107.50 was excessive because it exceeded his ability to pay. The defendant's ability to pay is one factor that the district court is required to consider in setting the amount of a fine. *See* 18 U.S.C. § 3572(a); U.S.S.G. § 5E1.2(d). The government does not identify, and this court's review of the record does not reveal, any findings by the district court supporting Foote's ability to pay a fine of $104,107.50. District courts are not required to make specific findings in cases where uncontested evidence establishes the defendant's

---

[8]Foote's argument that the "[a]ll . . . limitations on remedies" language in § 2320(c) prohibited the district court from imposing a period of supervised release fails for the same reason. Congress specifically authorized district courts to impose supervised release in criminal cases, and the Lanham Act provides for no limitations on this form of criminal punishment. *See* 18 U.S.C. § 3583(a).

ability to pay.  *United States v. Nez*, 945 F.2d 341, 343 (10th Cir. 1991).  In this case, however, Foote disputed his ability to pay and presented evidence in support of his position.  The district court on remand should therefore make findings regarding Foote's ability to pay and consider these findings in deciding the amount of the fine to impose.

In addition, the district court erred in delegating the creation of a payment schedule to the probation office.  When a district court provides that a criminal fine be paid in installments, 18 U.S.C. § 3572 requires the court to specify the period of time over which the payments must be made.  *See* 18 U.S.C. § 3572(d).  The court has no discretion to delegate this function.  *United States v. Miller*, 77 F.3d 71, 78 (4th Cir. 1996) (holding that the district court may not delegate the payment schedule for a criminal fine); *cf. United States v. Overholt*, 307 F.3d 1231, 1255 (10th Cir. 2002) (holding that the district court may not delegate creation of a restitution payment schedule).  On remand, the district court should provide a schedule for payment of the criminal fine.[9]

---

[9]The district court may make use of the probation office for assistance in developing a payment schedule, as long as it retains and exercises ultimate responsibility for the decision.  *United States v. Miller*, 77 F.3d 71, 77 (4th Cir. 1996).

### 4. *Drug-testing condition*

Finally, Foote argues that the district court erroneously thought itself bound to impose drug testing as a condition of probation. This court agrees that the district court's statements at the sentencing hearing appear to indicate that the court felt it was obligated to impose a drug-testing condition. The statute relied on by the district court, however, provides that a drug-testing condition "may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable sentencing information indicates a low risk of future substance abuse by the defendant." 18 U.S.C. § 3563(a)(5). On remand, the district court should therefore consider whether to ameliorate or suspend the drug testing condition pursuant to its discretionary authority under 18 U.S.C. § 3563(a)(5).

## IV. CONCLUSION

For the foregoing reasons, Foote's convictions are **AFFIRMED**. The case is **REMANDED** to the district court with instructions to vacate Foote's sentence and resentence him in accordance with this opinion. Foote's motion to supplement the record on appeal with the counterfeit Mont Blanc pen is **DENIED**.