**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 16, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 05-8058

ROBERT JAMES SANDERS,

Defendant - Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**[*]
**(D.C. NO. 05-CR-15-D)**

James H. Barrett, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with him on the brief), Cheyenne, Wyoming, for the Defendant - Appellant.

Kerry J. Jacobson, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), Lander, Wyoming, for the Plaintiff - Appellee.

Before **TACHA**, **HARTZ**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

Robert James Sanders appeals his sentence on a conviction for possession of a firearm by a convicted felon. He contends that the district court erred by not applying the sentencing guideline that reduces the offense level when the firearm is possessed solely for a "sporting" purpose. We hold that the district court could properly decline to apply the guideline on the ground that Mr. Sanders had threatened to shoot various persons with a firearm, even though he was not carrying a firearm when he made the threats.

## I.    BACKGROUND

On January 20, 2005, a federal grand jury returned a two-count indictment against Mr. Sanders. Count one charged possession of three firearms after a previous felony conviction, *see* 18 U.S.C. § 922(g)(1), and count two charged possession of the three firearms following a misdemeanor domestic-violence conviction, *see id.* § 922(g)(9). Under a plea agreement Mr. Sanders pleaded guilty to count two, and count one was dismissed.

The presentence report (PSR) calculated a base offense level of 14, *see* United States Sentencing Guidelines (USSG) § 2K2.1(a)(6), plus an increase of two levels because the offense involved three firearms, *see id.* § 2K2.1(b)(1). With a three-level downward adjustment for acceptance of responsibility, *see id.* § 3E1.1, the total offense level became 13. Mr. Sanders's criminal history placed him in category III, resulting in an advisory Guidelines range of 18-24 months.

Before sentencing, Mr. Sanders filed a memorandum contending that the offense level should be reduced to six under USSG § 2K2.1(b)(2), which provides:

> If the defendant, other than a defendant subject to [certain provisions inapplicable here], possessed all ammunition and firearms solely for lawful sporting purposes or collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition, decrease the offense level determined above to level 6.

A supplemental addendum to the PSR stated that the exception did not apply because "repeated threats to inflict deadly harm upon others indicate the defendant did not possess these firearms 'solely' for lawful sporting purposes or collection. The burden rests upon the defendant to prove otherwise."
R. Vol. 4 Supp. Add.

The district court conducted an evidentiary hearing regarding these threats. Officer Robert Cercle of the Lander, Wyoming, police department testified as follows: On November 17, 2004, Mr. Sanders appeared in court in Lander on a child-custody dispute. Deputy John Applegate had heard rumors that Mr. Sanders had threatened people involved in the dispute. When he questioned Mr. Sanders outside the courtroom, Mr. Sanders told him that although he had no intention of doing anything in court that day, if his children were taken away he would shoot people and police would have to kill him to stop him.

The next day Jason Southwick, the Department of Family Services employee in charge of the case, called police to report that Kathy Kendall,

-3-

Mr. Sanders's mother-in-law, had told him that Mr. Sanders had become upset at the prospect of having to be chaperoned while he visited his children and had said that he was going to put a bullet in Mr. Southwick's head. Officer Cercle called Mr. Sanders's cell phone and attempted to speak with him, but he hung up. A few minutes later Mr. Sanders called back to speak with Officer Cercle and explained to him "why he had the right to shoot people." R. Vol. 2 at 12. He told Officer Cercle, "I'll let my rifle do the talking for me," *id*., and, "The only way you can stop me from shooting people is to shoot me," *id*. at 13.

Mr. Sanders was located and arrested shortly thereafter. He told the arresting officers that they did not need their rifles because he did not have his with him. One of the officers asked Mr. Sanders why he was threatening people, to which he responded, "[T]hese are not threats; these are promises." *Id*. at 33. A search of Mr. Sanders's trailer revealed three rifles. Although no ammunition was found, Officer Cercle testified that it could easily be purchased at several locations in the small town.

Mr. Sanders testified that he used the rifles only for hunting. He denied making any statements at the custody hearing other than "if my kids get taken from me it will kill me." *Id*. at 40. According to his testimony, he was not upset after the hearing and actually had coffee with his wife and her parents, and then picked his children up from school and took them to his house. He returned them to their grandmother, Ms. Kendall, that evening. She called him the next day and

-4-

told him that Mr. Southwick had said he needed supervision when he visited the kids, which made him angry:

> [Defense Counsel]: Did you threaten to put a bullet in Mr. Southwick's head?
>
> [Mr. Sanders]: I don't recall exactly what I said.

*Id*. at 43. He also could not recall the specifics of his conversation with Officer Cercle:

> [Defense Counsel]: Is it your—would it be your position that you may have said those things but you don't recall them?
>
> [Mr. Sanders]: I may have said some of them things, yes.

*Id*. at 47. Finally, he testified that he did not have his guns with him at any point on November 17 or 18, and never threatened to kill anyone.

In a written order the district court held that the sporting-purpose exception did not apply. It found that Mr. Sanders had made the threats described by Officer Cercle. It also found that Mr. Sanders was not in possession of a firearm when any of the threats were made. The court framed the issue as follows:

> If the Defendant had made no threats at any time, it would be clear that the firearms were possessed solely for lawful sporting purposes. Indeed, the Defendant had hunted with the firearms in the past and there is no evidence that he ever "used" them for anything other than lawful sporting purposes. Conversely, if the Defendant had brandished the firearms while making threats to inflict bodily harm, he certainly could not make use of the exception. *See United States v. Borer*, [412 F.3d 987, 993-94] (8th Cir. 2005). Whether the verbal threats, made while the firearms were not in the immediate possession of the Defendant, are sufficient to convert the purpose of

the firearms to something other than lawful sporting purposes is a matter of first impression.

R. Vol I Doc 44 at 10-11.  The district court then concluded that "the Defendant's specific threats to use a firearm to inflict bodily harm, coupled with his access to the firearms and the relative ease with which he could have obtained ammunition, foreclose application of the 'sporting purposes exception.'" *Id*. at 11; *see also id.* at 12 ("Given the Defendant's direct threats to use firearms to inflict death or injury and his access to firearms and ammunition, the Court cannot conclude that the firearms were possessed *solely* for the innocent purpose of hunting.").  The court proceeded to consider the Guidelines range and the other factors set forth in 18 U.S.C. § 3553(a), and sentenced Mr. Sanders to 15 months' imprisonment.

## II.    DISCUSSION

We now review sentences under a reasonableness standard. *See United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006).  Reasonableness review "encompasses both the reasonableness of the length of the sentence, as well as the *method* by which the sentence was calculated." *Id*. at 1055.  Because the Guidelines must still be considered when imposing a sentence, "[a] sentence cannot . . . be considered reasonable . . . if it was based on an improper determination of the applicable Guidelines range." *Id*.  In determining whether the Guidelines range was correctly calculated "we review factual findings for clear error and legal determinations de novo." *Id*. at 1054; *see United States v.*

*Bayles*, 310 F.3d 1302, 1308 (10th Cir. 2002) ("We review the district court's factual determination that the firearm was not intended 'solely for lawful sporting purposes or collection' for clear error."). Mr. Sanders contends that his sentence is unreasonable because the district court failed to apply correctly USSG § 2K2.1(b)(2) to reduce his sentence.

"It is the defendant's burden to show the applicability of U.S.S.G. § 2K2.1(b)(2)." *United States v. Collins*, 313 F.3d 1251, 1254 (10th Cir. 2002). "The text of the provision requires a defendant to show two things: (1) that the defendant '*possessed* all ammunition and firearms solely for lawful sporting purposes or collection' *and* (2) that he 'did not unlawfully discharge or otherwise unlawfully *use* such firearms or ammunition.'" *Id.* It is undisputed in this case that Mr. Sanders did not "unlawfully discharge or . . . use" the firearms. We focus, then, on whether he "possessed" them "solely for lawful sporting purposes or collection."

The purpose for which the firearm is possessed is "determined by the surrounding circumstances." USSG § 2K2.1 cmt. 7. "Relevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history . . . , and the extent to which possession was restricted by local law." *Id.*

Here, Mr. Sanders repeatedly stated that he intended to shoot someone with his firearms. Perhaps he was just venting anger or bluffing. But it would be reasonable to infer that he actually meant to use the rifles for such a purpose, or, if not to fire them, to coerce others by instilling fear that he would fire them. Thus, although it was uncontroverted that he had obtained the rifles for hunting and that had been their sole prior use, the court could properly find that in addition to this sporting purpose Mr. Sanders had acquired the new purpose for possessing the firearms of using them to coerce and injure people. One can have a purpose for possessing a firearm before actually using the firearm for that purpose. For example, one who has bought a rifle to use for hunting has "hunting" as a purpose for possessing the rifle even if he has not yet gone on a hunting trip. The district court did not clearly err in finding that Mr. Sanders had failed to meet his burden of showing that his exclusive purpose for possessing the rifles was "sporting," as required by § 2K2.1(b)(2).

## III.  CONCLUSION

The district court did not improperly apply the Guidelines, and Mr. Sanders does not otherwise challenge the reasonableness of his sentence. *See Kristl*, 437 F.3d at 1054 ("[A] sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." (internal quotation marks omitted)).  We AFFIRM the judgment of the district court.