**F I L E D**

**UNITED STATES COURT OF APPEALS**

**September 19, 2006**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | No. 06-7035 |
| v. | (E.D. Oklahoma) |
| STANLEY BRERETON, | (D.C. No. 05-CR-41-P) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **ANDERSON**, and **BRORBY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Defendant-appellant Stanley Brereton pled guilty to one count of unauthorized use of a communication service, in violation of 47 U.S.C.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

§ 605(e)(4). He was sentenced to twelve months and one day of imprisonment, followed by twelve months of supervised release. He was also ordered to pay restitution in the amount of $39,275.52. Brereton appeals his sentence, which we affirm.

## BACKGROUND

Defendant Stanley Brereton and his brother, Stacy, operated a business communications company called Brerecom in Wilson, Oklahoma. In February 2004, Deputy Sheriff Gregg Johnson, of the Carter County Sheriff's Department in Ardmore, Oklahoma, was assigned to the District Attorney's Drug and Violent Crime Task Force. Johnson was conducting a narcotics investigation in the area of Wilson, Oklahoma. During that investigation, Johnson and another officer executed a search warrant at the house of Andy Nipp. While searching Nipp's residence, Nipp provided Johnson with a DIRECTV access card that Nipp said had been illegally reprogrammed by Brerecom. This enabled the holder of the illegally reprogrammed card to view DIRECTV programming without having to pay the monthly subscriber fee.[1]

---

[1]DIRECTV delivers approximately 225 channels of digital entertainment and information television programming to homes and businesses in the United States that are equipped with DIRECTV hardware (a mini-satellite dish, an integrated receiver/decoder ("IRD") and a DIRECTV Access card, which operates the IRD). DIRECTV programming includes major cable networks, major movie studios, special event programming, local channels, and a variety of other sports

(continued...)

On February 11, 2004, Johnson contacted Heidi Spangler with DIRECTV's Office of Signal Integrity. Spangler informed Johnson that Brerecom was not an authorized representative for DIRECTV and was not authorized to program DIRECTV Access cards. Later that same day, Johnson provided a voice recording device and $200.00 in cash to Shane Ayers. Ayers took a recently purchased DIRECTV Access card to Brerecom. Ayers went into defendant Brereton's house, which was adjacent to the Brerecom office, and, while there, Ayers paid Brereton $200.00, for which Brereton reprogrammed the DIRECTV Access card, using his computer. Johnson subsequently confirmed with an authorized representative of DIRECTV that the cards Nipp and Ayers had given to Johnson were programmed to receive all DIRECTV channels, including pay-

---

[1](...continued)
and special interest programs and packages.

DIRECTV currently uses three versions of Access cards: the third generation card ("Period Three" or "P-3" card), the fourth generation card ("Period Four" or "P-4" card), and the fifth generation card ("D-1" card)). All cards have been programmed and assigned a unique electronic identification number. The cards are manufactured outside of the United States and are sold to consumers as a component of the IRD.

Consumers who subscribe to DIRECTV can subscribe to various monthly packages of programming, for which the subscriber pays a periodic fee, usually on a monthly basis. Additionally, subscribers can order individual pay-per-view events and movies. DIRECTV subscribers access its programming via an encrypted, or electronically scrambled, signal to prevent unauthorized reception. A subscriber's IRD acts like a computer to process the signal using the DIRECTV Access card. The DIRECTV Access card acts as a reprogrammable microprocessor and uses smart card technology to authorize decryption of the programming the subscriber has specially purchased.

per-view channels. There was no arrangement made to pay DIRECTV for this programming.

Between February 18 and 19, 2004, ten DIRECTV Access cards were voluntarily surrendered to law enforcement. Each individual tendering the card provided a written statement that he or she did not pay DIRECTV for programming; rather, each stated that he or she paid Stanley or Stacy Brereton to program their access cards, for fees ranging from $50.00 to $200.00. The individuals further stated that the Breretons had committed to reprogram their cards for free if DIRECTV disabled them.

On February 18, 2004, Angie Tibbs, a business neighbor of Brerecom, contacted Wilson Chief of Police Larry Stearns. She told Stearns that Stanley Brereton told her that he was leaving town and left a box of computer components at her business. Tibbs provided the box to Stearns who then turned it over to Johnson. The box contained fourteen DIRECTV Access cards, a computer hard drive, and ten additional computer components. When Johnson compared the computer components in the box with a DIRECTV Field Investigator's Handbook, he discovered that they were similar to those used to illegally program DIRECTV Access cards.

On February 20, 2004, Johnson and other law enforcement officers executed a search warrant on the Brereton residence. During the search, the officers seized fifty items ranging from computers, computer components,

computer disks, DIRECTV IRDs, DIRECTV Access cards, firearms and other evidence. On May 25, 2004, a federal search warrant was served on the Task Force for which Johnson was working and Johnson turned over various items seized from the Brereton residence. These items included thirty-five DIRECTV Access cards, a Western Digital hard drive, two laptop computers, two desktop computers, and Zip electronic media storage disks.

The seized items were sent to the Federal Bureau of Investigation's Computer Analysis Response team in Oklahoma City for further analysis. An examination of the hard drive revealed more than 5,000 Activation Scripts, which are software scripts utilized to illegally reprogram DIRECTV Access cards. Additionally, the investigators discovered more than 5,000 bin files, which are binary files which store access card information, including codes for local channel programming. They also discovered "Bootloader" software, which allows the use of Period 2 Access cards which were previously disabled by DIRECTV, as well as other software used to assist in illegally reprogramming access cards.

As indicated, Brereton pled guilty to the one count of unauthorized use of a communications service. He then proceeded to sentencing. At the sentencing hearing, the government presented testimony from Larry Rissler, a retired FBI agent and a consultant for DIRECTV and its anti-piracy program. Rissler testified about a DIRECTV study conducted in 2000 to determine the income lost from an access card that has been modified to receive all programming. The

study presented three methods for calculating loss. First, on the assumption that all of DIRECTV's offered programming, including all re-broadcasted pay-per-view events, is viewed, the loss was calculated at more than $1.3 million for the use of one access card for one year. Second, receipt of the same programming but with each pay-per-view event watched only once, was valued at $150,000 per year. The third method was based on the assumption "that the viewing habits of an individual using a hacked device would be at least as robust as the viewing habits of a legitimate top 10 percent of our paying subscribers." Tr. of Sentencing Hr'g at 16, R. Vol. 3. These top ten percent subscribers paid an average of $204.56 per month, for a total of approximately $2400 for the year. By contrast, an average DIRECTV subscriber's bill is approximately $60 per month.

In preparation for sentencing, the United States Probation Office prepared a presentence report ("PSR"). The PSR concluded that the base offense level for Brereton's crime was eight. Pursuant to United States Sentencing Commission, Guidelines Manual ("USSG") §2B5.3(b)(1)(B) (2004), if the infringement amount exceeds $5,000, the base offense level is increased in accordance with a table contained in USSG §2B1.1. The PSR calculated that the infringement amount in Brereton's case was $39,275.52, using the third method of calculating loss—i.e., assuming that sixteen illegally reprogrammed access cards were used for one year by viewers whose viewing habits were like those in the top ten percent of

DIRECTV subscribers.[2] According to USSG §2B1.1(b)(1)(D), if the loss was more than $30,000, the base offense level is increased by six.

The PSR further recommended a two-level upward adjustment to the base offense level because the offense involved the manufacture, importation or uploading of infringing items. See USSG §2B5.3(b)(3). The PSR also recommended a two-level upward adjustment because Brereton used a special skill in a manner that significantly facilitated the commission of the offense. See USSG §3B1.3. After a three-level downward adjustment for acceptance of responsibility, Brereton's total offense level was fifteen. With no criminal history points, Brereton's criminal history category was I. Based on an offense level of fifteen and a criminal history category of I, the PSR calculated Brereton's advisory Guideline sentence as eighteen to twenty-four months.

Brereton made three objections to the PSR. First, he argued that the loss amount "appears to represent an arbitrary number that . . . cannot be support[ed] by any competent evidence." Objections to PSR, R. Vol. 4. Second, he objected to the two-level increase in his offense level on the ground that he "manufacture[d], import[ed] or upload[ed]" an item, because he claimed he did none of those things. Third, Brereton objected to the two-level increase in his offense level on the ground that he used "special skill" under USSG §3B1.3.

_____

[2]Thus, 12 (months) x $204.56 (payment per month by top ten percent viewers) x 16 (number of access cards charged) = $39,275.52 (the loss to DIRECTV from a single illegally reprogrammed access card used for one year).

Brereton also filed a motion for a downward departure on the ground that he suffers from "multiple mental and physical ailments." Mot. for Downward Departure, R. Vol. 1, tab 17.

At Brereton's sentencing hearing, the court overruled Brereton's first two objections, but agreed that Brereton "did not use a special skill in the commission of the instant offense." Tr. of Sentencing Hr'g at 71, R. Vol. 3. This resulted in an offense level of thirteen, which yielded an advisory Guideline range of twelve to eighteen months. After denying Brereton's motion for a downward departure, the court sentenced him to twelve months and one day, followed by twelve months of supervised release.

Brereton appeals, arguing: (1) the "infringement amount" calculated for purposes of determining his offense level for sentencing was incorrectly calculated; (2) the sentencing Guideline offense characteristic of manufacturing an infringing item was not justified; and (3) the amount of restitution, which is the same as the infringement amount in issue (1), was incorrectly calculated.

**DISCUSSION**

**1. Infringement amount**

"We now review sentences under a reasonableness standard." United States v. Sanders, 449 F.3d 1087, 1090 (10th Cir. 2006) (citing United States v. Kristl, 437 F.3d 1050, 1053 (10th Cir. 2006) (per curiam)). A review for reasonableness "encompasses both the reasonableness of the length of the sentence, as well as the *method* by which the sentence was calculated." Kristl, 437 F.3d at 1055. "Because the Guidelines must still be considered when imposing a sentence, a sentence cannot be considered reasonable if it was based on an improper determination of the applicable Guidelines range." Sanders, 449 F.3d at 1090 (quotation and alterations omitted). In determining whether the district court correctly calculated an advisory Guideline sentence, "we review factual findings for clear error and legal determinations de novo." Id. (quotation omitted).

USSG §2B5.3(b)(1)(B) provides that, in cases involving "Criminal Infringement of Copyright or Trademark," the base offense level is increased in accordance with the "number of levels from the table in §2B1.1" if the "infringement amount" exceeds $5,000. As indicated, the district court increased Brereton's base offense level by six, after calculating the infringement amount on the assumption that those purchasing pirated DIRECTV access cards have viewing habits like those in the top ten percent of all DIRECTV customers. Larry Rissler, DIRECTV's consultant who testified at Brereton's sentencing hearing as

an expert for the government, explained the rationale behind this method of loss calculation:

> Our view was that if an individual were to spend a hundred or two hundred or three hundred dollars for a signal-theft device to get all of DirecTV's programming, that individual would probably be a fairly robust television watcher.

Tr. of Sentencing Hr'g at 15. Rissler further characterized that calculation as "very conservative." Id. at 17. He explained that "[a]necdotal information DirecTV developed indicates that the viewing habits of a pirate end-user are much greater than the viewing habits of a legitimate consumer. So that number is conservative, and I believe the . . . yearly figure that we've estimated of slightly over [$]39,000 is also conservative." Id.

The application notes to USSG §2B5.3 further describe how the "infringement amount" is to be calculated:

> The infringement amount is the retail value of the infringed item, multiplied by the number of infringing items, in a case involving . . . the illegal interception of a satellite cable transmission in violation of 18 U.S.C. § 2511. (In a case involving such an offense, the "retail value of the infringed item" is the price the user of the transmission would have paid to lawfully receive that transmission, and the "infringed item" is the satellite transmission rather than the intercepting device.)

USSG §2B5.3, comment. (n.2(A)(iv)). "District courts have considerable leeway in assessing the retail value of the infringing items, and need only make a reasonable estimate of the loss, given the available information." United States v.

Foote, 413 F.3d 1240, 1251 (10th Cir. 2005) (quotation omitted). Further, "[t]he district court's methodology is reviewed for clear error." Id.

Brereton cites no case authority for his argument that the district court's methodology was clearly erroneous. The government cites only one case supporting this method of calculating the infringement amount. See DIRECTV, Inc. v. Pahnke, 405 F. Supp. 2d 1182, 1192 (E.D. Cal. 2005). We have found no other authority on the issue. Given the lack of any more accurate method to calculate the value of the loss to DIRECTV from the use of pirated access cards, the court's decision to adopt the third method did not constitute clear error. See Foote, 413 F.3d at 1251. Moreover, we agree with the government's assertion that this amount is conservative, given that Brereton was only charged with making sixteen illegally programmed cards that were used for only one year, although law enforcement authorities found thirty-five such cards, and there was information that the scheme had been going on longer than one year.

## 2. Manufacturing an infringing item

USSG §2B5.3(b)(3) provides for a two-level increase in the base offense level if the infringement offense "involved the manufacture, importation, or uploading of infringing items." In applying this two-level increase, the district court held:

> [T]he evidence shows that the defendant had to reprogram the access cards in order for them to be suitable for obtaining unauthorized satellite cable transmissions which resulted in the creation of a different product.

> Having reviewed the presentence report and hearing the testimony regarding the defendant's actions in this case, the court is convinced that the defendant manufactured the access cards within the meaning of . . . [§ ]2B5.3(b)(2).

Tr. of Sentencing Hr'g at 70, R. Vol. 3.

Brereton argues that he did not "manufacture" anything, as "defined by Webster's Third New International Dictionary, Vol. II at p. 1378 (1976), [in which "manufacture" is defined] as 'to make (as raw material) into a product suitable for use.'" Appellant's Br. at 12. He argues that he only "modified" the access cards.

Brereton cites no authority for this argument, other than the dictionary. The government cites only an unpublished Ninth Circuit decision, in which the court upheld a two-level increase under USSG §2B5.3(b)(2) in a case similar to this one, stating:

> Application Note 1 defines "the infringing item" to mean "the item that violates the copyright or trademark laws." By permitting individuals to illegally gain access to scrambled electronic signals, the reprogrammed access cards fit the definition of "infringing item."

United States v. Mason, 38 Fed. Appx. 458, 459, 2002 WL 575840, at **1 (9th Cir. 2002) (unpublished) (quoting USSG §2B5.3, comment. (n.1)). We can find no other authority on this matter.

Interpreting the Guidelines with a nod towards common sense, we agree with the district court that Brereton manufactured an infringing item when he illegally reprogrammed access cards to permit unauthorized interception of DIRECTV programming. He did, indeed, thereby create a different item, one that did something the access card could not previously do.

### 3. Restitution amount

Brereton was ordered to make restitution of the amount of the loss suffered by DIRECTV. As he concedes, this is the same amount as the infringement amount he challenged in his first issue. Brereton further concedes that he did not object to the restitution order before the district court, so our review is for plain error only. United States v. Mitchell, 429 F.3d 952, 961 (10th Cir. 2005). We have already concluded that the court committed no error in calculating this amount, much less plain error.

Having concluded that the district court correctly applied the Guidelines in fashioning Brereton's sentence, we accord that advisory Guideline sentence a presumption of reasonableness. Kristl, 437 F.3d at 1054. Brereton makes no other argument that the sentence is unreasonable. We accordingly conclude that it is reasonable.

**CONCLUSION**

For the foregoing reasons, we AFFIRM Brereton's sentence.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge