# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1759
_____

United States of America,                     *
                                               *
                    Appellee,                  *
                                               *
        v.                                     *
                                               *
Michelle Ann Sweeney,                          *
                                               *
                    Appellant.                 *


_____

No. 09-1823                        Appeals from the United States
_____                        District Court for the
                                   District of Minnesota.


United States of America,                     *
                                               *
                    Appellee,                  *
                                               *
        v.                                     *
                                               *
Jon Henry Sweeney,                             *
                                               *
                    Appellant.                 *


_____

Submitted: February 10, 2010
Filed: July 13, 2010

_____

Before LOKEN, Chief Judge,[1] GRUENDER and BENTON, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Jon and Michelle Sweeney owned and operated Micro-Star Technology, a company that manufactured and sold cable television equipment. A federal grand jury charged the Sweeneys with manufacturing and distributing cable descramblers intended for unauthorized interception of cable signals and conspiracy to do so, *see* 47 U.S.C. § 553; 18 U.S.C. § 371, and currency structuring, *see* 31 U.S.C. § 5324. The grand jury also charged Mr. Sweeney with bankruptcy fraud, *see* 18 U.S.C. § 152. A jury found the Sweeneys guilty on all the submitted counts, except the jury acquitted Mr. Sweeney of the bankruptcy fraud charge. The district court[2] sentenced Mr. Sweeney to 70 months' imprisonment and a $150,000 fine and Mrs. Sweeney to 42 months' imprisonment and a $125,000 fine. The Sweeneys now appeal their convictions and sentences. For the following reasons, we affirm.

## I. BACKGROUND

From approximately 1995 to 2001, the Sweeneys owned and operated Micro-Star Technology. Micro-Star manufactured cable television descramblers and other cable television equipment, which it then sold to wholesalers and distributors. Cable television providers encrypt their cable signals, and the descrambler function contained in some cable boxes reverses that encryption, allowing for a clear picture

---

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[2]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

to be viewed.[3] Micro-Star manufactured and sold several models of descramblers, and one of their best-selling models was the ViewMaster 4000. Most of the descramblers Micro-Star sold were "nonaddressable," meaning that they would not respond to signals from a cable provider that restrict the viewer's access to encrypted programs. In this way, users of the ViewMaster 4000 and other descramblers could obtain cable programming without paying for it. Descramblers, whether addressable or not, also have legitimate uses: they allow users to save descrambler rental fees by informing their cable provider that they already own a descrambler and asking to be charged only for programming, and they allow users to display one cable signal on several different televisions.

Additionally, Micro-Star sold "authorization control devices," such as the PiO. These devices can be installed before a cable provider's descrambler and block the cable provider's access control signals. Like a nonaddressable descrambler, they allow the user to view cable programming without paying for it. The authorization control devices too have a potentially legitimate function in that they can be used to block access to certain signals, thereby serving as a parental control device.

The Sweeneys employed several people at Micro-Star to manufacture descramblers. For instance, Mrs. Sweeney recruited her neighbor, Bonnie Mertes, who assembled descramblers between 1995 and 2000. Initially, Mrs. Sweeney paid Mertes in cash. Later, although Mertes was working for Micro-Star, her paychecks came from Nurses, Inc., a company owned by Mrs. Sweeney's sister-in-law. Mertes's daughters also worked for Micro-Star intermittently, testing the circuit boards that were used in the descramblers.

---

[3]We will refer to cable boxes capable of reversing such encryption as "descramblers."

At trial, the Government first presented evidence relating to the charges of assisting in the unauthorized interception of cable signals and conspiracy. Mertes testified about Micro-Star's operations, including its manufacturing process, its payroll, and the tasks of various employees. Robert Kramer testified that he earned between $800 and $1,000 each week repairing defective Micro-Star descramblers. He also described the technical advice he gave Mr. Sweeney about competitors' descramblers. Additionally, Daniel Quade and Abe Paquette, who operated Core Innovation Systems, testified about their weekly purchases of large numbers of ViewMaster 4000s from Micro-Star and their distribution to other wholesalers and end-users. Quade testified that he believed most purchasers of the ViewMaster 4000 intended to use the device to steal cable programming. He went on to say that his customers reported that the ViewMaster 4000 devices were working as intended, successfully descrambling cable programs.

Michael Muller testified as an expert witness, providing technical information about descramblers based on his work as a product security specialist and manager at Motorola. Muller explained that nonaddressable descramblers, such as the ViewMaster 4000, ignore access restrictions included in a cable provider's signal and that authorization control devices, such as the PiOs, remove the access control instructions that a cable box would otherwise receive. Consequently, both types of equipment allow their users to view cable television programming without paying for it. Muller also testified that the only purpose of the nonaddressable function in a descrambler is to allow for the theft of cable programming.

Several law enforcement officers also testified at trial, including Officer Steve Miller of the Elk River Police Department, who testified about his involvement in executing a search warrant at Micro-Star's facility. While police were executing the warrant, Mr. Sweeney arrived. The following exchange took place during Officer Miller's testimony:

Q. Did you see him [Mr. Sweeney] or did you have interaction with him shortly after he arrived at the business?

A. I was in the front and he came in. He identified himself with a formal Minnesota driver's license. I asked him if he wanted to give a statement, read him his Miranda warning. He requested to call an attorney—

Mr. Sweeney objected and moved for a mistrial, citing *Doyle v. Ohio*, 426 U.S. 610 (1976). The Government claimed that the disclosure of Mr. Sweeney's invocation of his right to counsel was inadvertent. The district court offered a curative instruction, but the defendants both declined that offer. The district court then denied the motion for a mistrial.

After presenting its evidence relating to the charges of assisting in the unauthorized interception of cable signals and conspiracy, the Government turned to the currency structuring charges. The indictment alleged thirteen counts of currency structuring. Count 8 alleged that the Sweeneys aided and abetted each other in illegally structuring the payment for a Chrysler Town and Country minivan. Steven Carbone, the dealership's finance manager, testified that he told the Sweeneys that he was required to file a currency transaction report for any cash transaction over $10,000. Mr. Sweeney responded, "Then let's not put $10,000 down." Mr. Sweeney gave Carbone $10,000 in cash, and Carbone immediately returned $100 of it to Mr. Sweeney. Mrs. Sweeney then wrote a check for the balance of $22,263.22. Count 9 alleged that Mr. Sweeney illegally structured another transaction involving a vehicle, this time the purchase of a Ford Focus. Having already paid a $50 cash deposit, Mr. Sweeney again paid $9,900 in cash and the balance of $749.75 by check. When the salesman, Richard Wolfe, commented that this was a large amount of cash, Mr. Sweeney replied, "Yeah, if you spent $10,000 in cash, you would have to report it to the IRS."

Counts 10 through 20 charged Mrs. Sweeney with illegally structuring transactions at First National Bank of Elk River. Each count corresponded to a different $9,900 cash withdrawal or deposit by Mrs. Sweeney between March 11, 2002, and December 1, 2003. The district court dismissed as multiplicitous all but one of these counts, leaving only Count 15 to be submitted to the jury. Count 15 described a $9,900 cash withdrawal by Mrs. Sweeney on October 28, 2002. However, the district court allowed the Government to introduce evidence of the other ten transactions, described in Counts 10 through 14 and 16 through 20, along with other cash transactions not specifically identified in the indictment. And several bank employees testified about an inquiry that Mrs. Sweeney made on March 11, 2002, regarding currency transaction reporting requirements. In response to Mrs. Sweeney's inquiry, bank employees informed her that any cash transaction in excess of $10,000 had to be reported.

The jury found the Sweeneys guilty on the charges of assisting in the unauthorized interception of cable signals and conspiracy to do so. Mr. Sweeney was acquitted on the bankruptcy fraud count. The jury further found Mr. Sweeney guilty of illegally structuring currency transactions related to both vehicle purchases. Mrs. Sweeney was also found guilty of illegally structuring the purchase of the minivan and structuring a currency transaction at the First National Bank of Elk River. The district court denied the Sweeneys' motions for judgment of acquittal and for a new trial.

At sentencing, the parties agreed and the district court concluded that section 2B5.3 of the United States Sentencing Guidelines applied to the Sweeneys' convictions for assisting in the unauthorized interception of cable signals and conspiracy. Section 2B5.3 provides for a base offense level of 8 and for an enhancement based on the amount of loss, termed the "infringement amount." The arguments at sentencing focused primarily on the proper method for calculating the infringement amount. The district court found that $6,435,602, the gross revenues of Micro-Star, was a reasonable estimate of the infringement amount. The district court

also credited an alternative infringement amount of $62,531,621, based on calculations by FBI Special Agent Dean Chappell and Brian Richert, a director of financial planning and analysis for Comcast, a large cable television provider. Opting for the lower figure, the district court increased the defendants' base offense levels by 18 levels, the enhancement corresponding to an infringement amount between $2.5 million and $7 million.

After making other rulings and adjustments that Mr. Sweeney does not challenge on appeal, the district court arrived at an advisory sentencing guidelines range for Mr. Sweeney of 97 to 121 months. After considering the factors set out in 18 U.S.C. § 3553(a), the court varied downward and sentenced Mr. Sweeney to 70 months' imprisonment and a $150,000 fine.

In calculating Mrs. Sweeney's guidelines range, the district court applied a two-level increase under section 2B5.3(b)(3) for manufacturing infringing items. The court denied Mrs. Sweeney's request for a 4-level reduction under section 3B1.2 for having a minimal role in the offense but granted a 2-level reduction for her minor role. Finally, Mrs. Sweeney argued that her base offense level for the currency structuring offenses should be reduced to 6 under the safe harbor provision of section 2S1.3(b)(3) because the funds involved in the currency structuring offenses were not the proceeds of illegal activity and she did not act with reckless disregard as to the source of the funds. In contrast, the Government argued that Mrs. Sweeney's offense level should be increased by 2 levels under section 2S1.3(b)(1)(A) because Mrs. Sweeney knew that the funds were from the sale of descramblers intended to be used for the unauthorized interception of cable programming. The district court held that it did not have sufficient evidence regarding the source of the funds and, therefore, denied both Mrs. Sweeney's requested reduction and the Government's requested enhancement. Arriving at a total offense level of 26 and a criminal history category of I, the district court found Mrs. Sweeney's advisory guidelines range to be 63 to 78 months. The court again varied downward after considering the § 3553(a) factors and sentenced

Mrs. Sweeney to 42 months' imprisonment and a $125,000 fine. The Sweeneys now appeal.

## II. DISCUSSION

The Sweeneys each raise several issues on appeal. Both Mr. and Mrs. Sweeney argue that there was insufficient evidence to convict them of assisting in the unauthorized interception of cable signals and conspiracy to do so. They also challenge the sufficiency of the evidence on Count 8, structuring the payment for the minivan. Likewise, Mr. Sweeney challenges the sufficiency of the evidence related to Count 9, structuring the payment for the Ford Focus. Mrs. Sweeney challenges the sufficiency of the evidence to support her conviction on Count 15, structuring a transaction at First National Bank of Elk River. Mr. Sweeney also argues that the Government violated *Doyle v. Ohio*, 426 U.S. 610 (1976), in its questioning of Officer Miller. With respect to sentencing, both defendants challenge the district court's calculation of the infringement amount under U.S.S.G. § 2B5.3. In addition, Mrs. Sweeney challenges the 2-level increase for manufacturing infringing items, the denial of a 4-level reduction for having a minimal role in the offense, and the denial of a reduction under the safe harbor provision of section 2S1.3. We address each argument in turn.

### A. Sufficiency of the evidence — Assisting in unauthorized interception

The Sweeneys challenge the sufficiency of the evidence to support their convictions for violating 47 U.S.C. § 553(a)(1). Section 553 prohibits "assist[ing] in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." The statute goes on to define "assist[ing] in intercepting or receiving" to include "the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized

-8-

reception of any communications service offered over a cable system." *Id.* § 553(a)(2). "We review[] the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict. Reversal of a conviction is proper only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Pliego*, 578 F.3d 938, 941 (8th Cir. 2009) (quoting *United States v. Kent*, 531 F.3d 642, 651-52 (8th Cir. 2008)), *cert. denied*, 558 U.S. ---, 130 S. Ct. 1109 (2010).

The Sweeneys do not dispute that the products Micro-Star manufactured and sold could be used to intercept cable signals illegally. They point out, however, that Congress has not made the manufacture or distribution of such products illegal per se. Rather, the statute only criminalizes the manufacture or distribution of equipment that the manufacturer or distributor intends to be used for the unauthorized interception of cable service. The Sweeneys claim that the Government presented insufficient evidence of such an intent on their part, pointing to the alternative, legal uses of descramblers and authorization control devices.

Because "[d]irect evidence of a defendant's mental state frequently is unavailable, . . . the jury is entitled to scrutinize and make reasonable inferences from [the] defendant's conduct and from all facts surrounding the incident in question." *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006) (internal citation and quotations omitted). Here, the Government presented sufficient evidence to allow a reasonable jury to find that the Sweeneys intended the descramblers and authorization control devices Micro-Star manufactured and sold to be used to steal cable programming. Muller, the Government's cable industry expert, testified that he was aware of no purpose for the nonaddressable feature of the descramblers that Micro-Star produced and sold other than facilitating the theft of cable programming. *See also Cont'l Cablevision, Inc. v. Poll*, 124 F.3d 1044, 1047 (9th Cir. 1997) (finding that nonaddressable nature of cable boxes was evidence of intent); *Intermedia Partners Se. Gen. P'ship v. QB Distribs., LLC*, 999 F. Supp. 1274, 1280 (D. Minn. 1998) ("The

Court finds persuasive the uncontroverted testimony . . . that the non-addressable decoding devices manufactured and sold by defendants have no legitimate purpose."). Similarly, Quade, one of the owners of Core Innovation Systems, testified that he knew the descramblers he purchased from Micro-Star and resold would eventually be used to intercept cable programming illegally. Micro-Star employee Mertes testified about using a descrambler in her home that Mr. Sweeney personally sold to her to receive premium programming without paying for it, just as Muller and Quade described. Finally, news articles found in the Sweeneys' home detailed other criminal and civil prosecutions against people similarly engaged in manufacturing and distributing descramblers. *See United States v. Mills*, 987 F.2d 1311, 1314 (8th Cir. 1993) (noting that newspaper articles of schemes similar to the defendant's were relevant to the defendant's intent); *United States v. Ellis*, 326 F.3d 550, 555 (4th Cir. 2003) (considering articles as evidence of knowledge and intent). Together, the Government's evidence was sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that the Sweeneys intended that the descramblers and authorization control devices Micro-Star manufactured and sold be used for the unauthorized interception of cable signals and that the Sweeneys therefore violated 47 U.S.C. § 553. *See also Comcast of Ill. X v. Multi-Vision Elecs., Inc.* 491 F.3d 938, 945 (8th Cir. 2007) (rejecting, in a civil case, an argument that the potential legitimate uses of a descrambler showed a lack of intent).

### B.     Sufficiency of the evidence — Conspiracy

The Sweeneys also challenge the sufficiency of the evidence supporting their convictions on the conspiracy count. "To prove conspiracy under [18 U.S.C.] § 371, the Government must show beyond a reasonable doubt that the [defendants] knowingly 'entered into an agreement or reached an understanding to commit a crime,' and that at least one of the [defendants] 'overtly acted in furtherance of the agreement.'" *United States v. Farrell*, 563 F.3d 364, 376 (8th Cir. 2009) (quoting *United States v. Bertling*, 510 F.3d 804, 808 (8th Cir. 2007)). Using a special verdict

form, the jury found that Mr. Sweeney conspired with Quade, Paquette, Kramer, and Mrs. Sweeney and that Mrs. Sweeney conspired with Mr. Sweeney. As before, we examine this issue de novo, viewing the evidence in the light most favorable to the verdict, and we will not reverse if any reasonable jury could have found the defendants guilty. *Pliego*, 578 F.3d at 941.

The Sweeneys argue that there was no conspiratorial agreement, so there was no conspiracy, or at least no conspiracy they agreed to join. *See United States v. Lopez-Arce*, 267 F.3d 775, 781 (8th Cir. 2001) ("The essence of the crime of conspiracy is the 'agreement to commit an unlawful act.'" (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975))). Mr. Sweeney contends that his relationship with Kramer, Quade, and Paquette was merely a buyer-seller relationship, not a conspiracy. *See United States v. Pizano*, 421 F.3d 707, 719 (8th Cir. 2005) ("Mere proof of a buyer-seller agreement without any prior or contemporaneous understanding does not support a conspiracy conviction because there is no *common* illegal purpose: 'In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell.'" (quoting *United States v. Prieskorn*, 658 F.2d 631, 634 (8th Cir. 1981))). However, Mr. Sweeney offers little argument about whether the evidence showed an agreement with Mrs. Sweeney. Mrs. Sweeney contends that her involvement in Micro-Star's operations was simply too limited to show a conspiratorial agreement with Mr. Sweeney.

There is ample evidence to support the jury's finding that the Sweeneys formed an agreement with each other and therefore to support their convictions. "A formal agreement is not required to create a conspiracy, and the existence of a conspiracy can be proved by direct or circumstantial evidence." *United States v. Williams*, 534 F.3d 980, 985 (8th Cir. 2008). Jon and Michelle Sweeney jointly operated Micro-Star; indeed the company was originally named J&M Fulfillment. Mr. Sweeney's deep involvement in Micro-Star is undisputed. While Mrs. Sweeney points to evidence, such as her family commitments, suggesting that she had very limited opportunity to

participate in Micro-Star's operations, the testimony of Mertes and others undermines her claims. "In reviewing the sufficiency of the evidence, 'we must not weigh the evidence or assess the credibility of witnesses.'" *United States v. Littlewind*, 595 F.3d 876, 882 (8th Cir. 2010) (quoting *United States v. Raplinger*, 555 F.3d 687, 693 (8th Cir.), *cert. denied*, 557 U.S. ---, 129 S. Ct. 2814 (2009)). Mertes testified that Mrs. Sweeney recruited her to work at Micro-Star. Several witnesses testified that Mrs. Sweeney spent time assembling descramblers, preparing them for shipping, and preparing billing. At times, Mrs. Sweeney paid Micro-Star employees. Thus, while Mrs. Sweeney can point to other testimony that could support a finding that she played a somewhat limited role in the manufacturing and distributing of descramblers, there is sufficient evidence for a jury to conclude that she and Mr. Sweeney entered a conspiratorial agreement with the illegal purpose of assisting in the unauthorized interception of cable signals. We therefore affirm the Sweeneys' conspiracy convictions.[4]

---

[4]As a result, we need not reach the question of whether there was sufficient evidence of an agreement between Mr. Sweeney and Quade, Paquette, or Kramer. *See United States v. Daychild*, 357 F.3d 1082, 1098 n.25 (9th Cir. 2004); *United States v. Tarpley*, 945 F.2d 806, 810 (5th Cir. 1991). We note, however, the "evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture" between Micro-Star and Kramer's repair business, as well as Quade and Paquette's company, Core Innovation Systems. *See United States v. Gee*, 226 F.3d 885, 894 (7th Cir. 2000) (internal quotation marks omitted). Mr. Sweeney told customers to send defective descramblers directly to Kramer, whom he prepaid for much of the repair work. Kramer also had access to Mr. Sweeney's UPS account. Quade and Paquette purchased descramblers from Micro-Star on a weekly basis from 2000 to 2002, and Micro-Star was their only supplier of ViewMaster 4000s. Quade and Paquette eventually stopped even examining the products that Micro-Star sold them, simply placing new shipping labels on the boxes and shipping them to other distributors and end-users.

## C.    Sufficiency of the evidence — Currency structuring

The Sweeneys next challenge their convictions on Counts 8, 9, and 15, the currency structuring charges. Although our standard of review again requires us to view the evidence in the light most favorable to the verdict, *Pliego*, 578 F.3d at 941, the relevant facts are virtually undisputed, so we will focus on the pertinent legal principles.

Generally speaking, domestic financial institutions are required to file reports on certain transactions that exceed a threshold amount designated by the Secretary of the Treasury. 31 U.S.C. § 5313(a). The relevant Treasury regulations set this threshold at $10,000. *See* 31 C.F.R. § 103.22(b)(1). There is no dispute that cash withdrawals from bank accounts and cash purchases at car dealerships exceeding the $10,000 threshold are both typically subject to the reporting requirement. *See id.* § 103.22(a), (b)(1), (d)(5)(viii).

Federal law prohibits persons from "structuring" cash transactions to evade this reporting requirement. *See* 31 U.S.C. § 5324(c)(3). Specifically, § 5324(c)(3) provides that "[n]o person shall, for the purpose of evading the reporting requirements of section 5313(a) . . . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions." In turn, the Treasury regulations interpreting § 5324 define what it means to "structure a transaction" as follows:

> [A] person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or

-13-

series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

31 C.F.R. § 103.11(gg). The regulations define the term "transaction" to include "purchase[s]" and "withdrawal[s]," among other things. *Id.* § 103.11(ii). We find that the Treasury regulations accurately describe the offense of structuring a transaction in violation of § 5324(c)(3). *Accord United States v. Van Allen*, 524 F.3d 814, 819-21 (7th Cir. 2008); *United States v. MacPherson*, 424 F.3d 183, 188 (2d Cir. 2005).[5]

There is no real dispute about the elements of the alleged offense. As the district court instructed the jury,

> The crime of currency structuring, as charged in Counts Eight, Nine, and Fifteen . . . , has three elements, which are:
>
> *One*, the defendant conducted or attempted to conduct a financial transaction that involved a domestic financial institution;
>
> *Two*, at the time the defendant conducted or attempted to conduct the financial transaction, the defendant knew of the domestic financial institution's obligation to report currency transactions in excess of $10,000; and
>
> *Three*, the defendant purposefully structured the transaction with the intent to evade that reporting requirement.

*Accord Van Allen*, 524 F.3d at 820; *MacPherson*, 424 F.3d at 189.

---

[5]The jury instruction describing the elements of currency structuring, as charged in Counts 8, 9, and 15, tracked the language that we have quoted from 31 C.F.R. § 103.11(gg). On appeal, the Sweeneys do not argue that the Treasury regulations impermissibly construe § 5324; nor do they argue that the regulations are invalid for any other reason.

The Sweeneys do not argue that the evidence was insufficient to establish either their knowledge of the reporting requirement or their intent to evade that requirement. A review of the evidence presented at trial leaves no doubt that the Sweeneys knew about the reporting requirement and intended to evade it. The question, the Sweeneys insist, is whether their acts amounted to "structuring a transaction."

The Sweeneys make two principal arguments in this vein. The first argument, pressed exclusively by Mrs. Sweeney, is that neither the purchase of the minivan (Count 8) nor her cash withdrawal from the First National Bank of Elk River on October 28, 2002 (Count 15), qualifies as a "transaction" under § 5324(c)(3). Each of those events, she asserts, merely involved "a single transfer of currency." And, according to Mrs. Sweeney, a "transfer" in an amount less than the $10,000 reporting threshold cannot be illegally structured. We are not persuaded.

Initially, we note that Mrs. Sweeney's argument about the meaning of the term "transaction" under § 5324(c)(3) amounts to a succession of ipse dixits. This entire subsection of Mrs. Sweeney's brief is conclusory and noticeably lacking in relevant legal authority. In any event, the key premise of her argument—that a purchase or withdrawal in an amount less than $10,000 is not a "transaction" and therefore cannot be structured—is decisively refuted by the Treasury regulations. Specifically, the term "transaction" is defined in 31 C.F.R. § 103.11(ii) to include "purchase[s]" and "withdrawal[s]." Moreover, 31 C.F.R. § 103.11(gg) provides that "a person structures a transaction [*e.g.*, a purchase or withdrawal] if that person . . . conducts or attempts to conduct *one* or more transactions [*e.g.*, purchases or withdrawals] in currency, *in any amount*, . . . *in any manner*, for the purpose of evading the reporting requirements." (Emphasis added.) *See also id.* ("The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition." (emphasis added)). We therefore reject the notion that neither the purchase of the

-15-

minivan nor the October 28 withdrawal qualifies as a "transaction" under § 5324(c)(3). On the contrary, both of those events are transactions, and the evidence shows that in both instances, Mrs. Sweeney acted with the intent to evade the reporting requirement.[6]

The Sweeneys' second argument starts from the premise that the only way to commit the offense of structuring a transaction is to "break up a single cash transaction that was above the [$10,000] reporting threshold into two or more separate transactions." *See Ratzlaf v. United States*, 510 U.S. 135, 136 (1994) (stating in dictum that "[i]t is illegal to 'structure' transactions—*i.e.*, to break up a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement"). The Sweeneys assert that the evidence on Counts 8, 9, and 15 failed to show that they broke up a single cash transaction that exceeded the $10,000 reporting threshold into two or more separate transactions. It follows, we are told, that the evidence was insufficient to prove that Mr. or Mrs. Sweeney committed the offense of structuring a transaction. Again, we are not persuaded.

---

[6]Along similar lines, the Sweeneys assert that because the relevant transactions were in amounts less than $10,000, "there simply was no reporting requirement" to evade. This assertion seems to suggest that, as far as the Sweeneys were concerned, the reporting requirement set out in 31 U.S.C. § 5313(a) and the corresponding Treasury regulations did not exist and therefore could not be evaded. To be sure, the reporting requirement is triggered only when the $10,000 threshold is met. But that does not mean the existence of the reporting requirement depends on how much money changes hands in a given transaction. The reporting requirement is a generally applicable law—it is on the books for all persons, at all times. Criminal liability under 31 U.S.C. § 5324 is not conditioned on whether the reporting requirement is actually triggered. Instead, § 5324 prohibits persons from conducting transactions with the intent to evade the reporting requirement, regardless of whether a plan to evade the reporting requirement succeeds (by staying below the $10,000 threshold) or fails (by exceeding the $10,000 threshold). *See* § 103.11(gg).

The central flaw in the Sweeneys' second argument is its starting premise, which confuses a sufficient condition for a necessary condition. While breaking up a single cash transaction that exceeds the $10,000 reporting threshold into two or more separate transactions is one way of committing the offense of structuring a transaction, it is not the only way. Recall once more that the Treasury regulations provide that "a person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, . . . *in any manner*, for the purpose of evading the reporting requirements." § 103.11(gg) (emphasis added). The regulations explain that "'[i]n any manner' includes, *but is not limited to*, the breaking down of a single sum of currency exceeding $10,000 into smaller sums . . . *or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000*." *Id.* (emphasis added). In our view, the regulations accurately describe the various ways that a person may commit the offense of currency structuring in violation of § 5324(c)(3). *See United States v. Hovind*, 305 Fed. App'x 615, 621 (11th Cir. 2008) (per curiam) ("By its plain language, the statute prohibits transactions of less than $10,000 that are intended to evade reporting requirements." (citing *United States v. Phipps*, 81 F.3d 1056, 1060-61 (11th Cir. 1996))). The Sweeneys would have us adopt a much narrower interpretation of the statute, but we see no sound basis for doing so.

Any residual doubt about the Sweeneys' second argument is dispelled by the Seventh Circuit's decision in *United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008), which we find persuasive. There, the defendant, relying on the Seventh Circuit's ruling in *United States v. Davenport*, 929 F.2d 1169 (7th Cir. 1991), made a nearly identical argument to the one the Sweeneys make here. In particular, the defendant argued "that the only method of proving structuring is to demonstrate that a defendant held a unitary cash hoard over $10,000 and then broke it up . . . in[to] amounts under $10,000." *Van Allen*, 524 F.3d at 820. The court recounted that in *Davenport* it had "upheld a conviction for structuring where the defendant made ten cash deposits, each under $10,000" and had "observed that the intent of the statute was to prevent

-17-

individuals from evading the reporting requirement 'by breaking their cash hoard into enough separate deposits to avoid activating the requirement.'" *Id.* at 820-21 (quoting *Davenport*, 929 F.2d at 1173). The court in *Van Allen* made clear, however, that it never held that breaking up a cash hoard "was the only method of proving structuring." *Id.* at 821. In fact, the court noted, *Davenport* "further defined 'structuring' as 'altering the form of a transaction in order to avoid activating the . . . duty to file a currency transaction report.'" *Id.* (quoting *Davenport*, 929 F.2d at 1173). This alternative definition of structuring, the court explained, "meshes well with that in the Treasury regulation," *id.* (citing § 103.11(gg)), which, of course, describes more than one way of structuring a transaction, *see* § 103.11(gg).

We hold that the evidence, viewed in the light most favorable to the verdict, was sufficient to support the Sweeneys' convictions on Counts 8, 9, and 15. As to Counts 8 and 9, the evidence showed that both Mr. and Mrs. Sweeney knew about the $10,000 reporting threshold and conducted the vehicle purchases in a manner designed to evade the reporting requirement. *See* § 103.11(gg); *see also Van Allen*, 524 F.3d at 821 (noting that the court had previously "defined 'structuring' as 'altering the form of a transaction in order to avoid activating the . . . duty to file a currency transaction report'" (quoting *Davenport*, 929 F.2d at 1173)). As to Count 15, the evidence showed that Mrs. Sweeney knew about the $10,000 reporting threshold and conducted a series of cash withdrawals—including the withdrawal of $9,900 on October 28, 2002—in a manner designed to evade the reporting requirement. *See* 31 C.F.R. § 103.11(gg); *see also Van Allen*, 524 F.3d at 820 (finding that the defendant engaged in illegal structuring by conducting a series of deposits and withdrawals, and explaining that "[t]he sheer volume of the transactions almost compels the conclusion reached by the jury").[7] Because the evidence was sufficient

---

[7]To be clear, the evidence of the withdrawal on October 28, 2002, was itself sufficient to support Mrs. Sweeney's conviction on Count 15. As the Treasury regulations explain, "[A] person structures a transaction if that person . . . conducts or attempts to conduct *one* or more transactions in currency, *in any amount*, . . . *in any*

on each count to prove that the Sweeneys conducted "one or more transactions in currency, in any amount, . . . in any manner, for the purpose of evading the [applicable] reporting requirement[]," § 103.11(gg), we affirm their convictions on the currency structuring charges.

### D.    *Doyle v. Ohio*

Mr. Sweeney argues that the district court erred in failing to declare a mistrial after Officer Miller testified that Mr. Sweeney invoked his right to counsel when Officer Miller began to question him.  In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment," *id.* at 619.  This rule also applies to a defendant's invocation of his right to an attorney.  *Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986).  The district court held that any potential *Doyle* violation was harmless beyond a reasonable doubt.  "We review claims of constitutional error de novo."  *United States v. Washington,* 318 F.3d 845, 854 (8th Cir. 2003).

The Government argues that no *Doyle* violation occurred because the Government did not deliberately elicit testimony regarding Mr. Sweeney's invocation of his right to counsel.  We need not reach the question whether an inadvertent disclosure under these circumstances violates *Doyle* if we find that any potential *Doyle* violation was harmless beyond a reasonable doubt. *See United States v. Martin*, 391 F.3d 949, 955 (8th Cir. 2005).

---

*manner*, for the purpose of evading the reporting requirements under section 103.22 of this part."  § 103.11(gg) (emphasis added).  Conducting a transaction "in any manner," includes "conduct[ing] . . . *a transaction* . . . at or *below $10,000.*"  *Id.* (emphasis added); *see also Hovind*, 305 Fed. App'x at 620 ("A cash transaction does not have to equal or exceed $10,000 to constitute a structuring offense . . . .").

-19-

"When analyzing whether *Doyle* violations are harmless beyond a reasonable doubt, this court examines (1) whether the government made repeated *Doyle* violations, (2) whether any curative effort was made by the trial court, (3) whether the defendant's exculpatory evidence is transparently frivolous, and (4) whether the other evidence of the defendant's guilt is otherwise overwhelming." *United States v. Gentry*, 555 F.3d 659, 663-64 (8th Cir. 2009) (quoting *Fields v. Leapley*, 30 F.3d 986, 991 (8th Cir. 1994)). Here, it is undisputed that there was only a single alleged *Doyle* violation. It is also undisputed that the district court offered to give a curative instruction to the jury, which the defendants declined. The Government concedes that the exculpatory evidence that the Sweeneys presented was not transparently frivolous. Finally, as described earlier, the Government otherwise presented overwhelming evidence of Mr. Sweeney's guilt. On balance, while the third factor counsels in favor of finding the violation was not harmless, we are convinced based on the other factors that this potential *Doyle* violation was harmless beyond a reasonable doubt. Therefore, the district court did not err in denying the motion for a mistrial.

## E.    Sentencing Issues

The Sweeneys appeal the district court's enhancement of their advisory sentencing guidelines ranges based on the court's determination of the "infringement amount," *see* U.S.S.G. § 2B5.3.[8] Generally, "[t]he infringement amount is the retail value of the infringed item, multiplied by the number of infringing items." U.S.S.G. § 2B5.3 cmt. n.2(A). The district court found that "it is not possible to determine the number of infringing items (in this case, the descramblers) or the number or value of

---

[8]At the outset, we reiterate that the parties agreed at sentencing that the district court should apply section 2B5.3. Accordingly, we assume for present purposes that the district court correctly found that "U.S.S.G. § 2B5.3, 'Criminal Infringement of Copyright or Trademark,' is the appropriate Guideline for determining the sentencing range applicable to the Sweeneys' convictions of conspiracy and unauthorized interception of cable service."

the infringed items (in this case, the stolen cable transmissions)." The court therefore made a reasonable estimate of the infringement amount, using Micro-Star's gross revenues, $6,435,602, as a starting point. *See* U.S.S.G. § 2B5.3 cmt. n.2(E) ("In a case in which the court cannot determine the number of infringing items, the court need only make a reasonable estimate of the infringement amount using any relevant information, including financial records."). Based on that estimate, the court increased the defendants' offense levels by 18 levels, the enhancement corresponding to an infringement amount between $2.5 million and $7 million. *See* U.S.S.G. §§ 2B5.3(b)(1)(B), 2B1.1(b)(1). "In reviewing a sentence for procedural error, we review the district court's factual findings for clear error and its application of the guidelines de novo." *United States v. Barker*, 556 F.3d 682, 689 (8th Cir. 2009).

The Sweeneys contend that because the Government did not prove that any of the descramblers were actually used to intercept cable signals illegally, there were no infringed items and the correct infringement amount was therefore $0. This borders on sophistry. It should go without saying that we must here start from the premise that the Sweeneys intended the descramblers they manufactured and sold to be used for the unauthorized interception of cable signals; after all, the jury found them guilty of violating 47 U.S.C. § 553(a)(2). Records seized from Micro-Star showed that the Sweeneys sold 178,260 descramblers between 1999 and 2001. (Micro-Star's sales in the years 1996, 1997, and 1998 could not be determined.) It is perfectly reasonable to infer that the majority of these descramblers were in fact used to steal cable programming. Thus, while the exact number and value of stolen cable transmissions are unknown, the infringement amount was undoubtedly greater than $0.

Contrary to the Sweeneys' contention, the district court properly resorted to the methodology set out in Application Note (2)(E), which provides that in these circumstances "the court need only make a *reasonable estimate* of the infringement amount using any relevant information, including financial records." (Emphasis

added.)  The dispositive question is whether the district court clearly erred in finding that the infringement amount exceeded $2.5 million.  The answer is "no."

As the district court observed,

> [T]he infringement amount must have exceeded Micro-Star's gross revenues.  Micro-Star did not sell descramblers to end users; rather, it sold them to people like Quade and Paquette, who resold them to other wholesalers, to retailers, and to end users.  Needless to say, the wholesalers who bought descramblers from Micro-Star marked up the price, and that price would continue to be marked up until the descramblers reached the hands of consumers.  Thus, the total amount that consumers paid to "retailers" for Micro-Star descramblers would greatly exceed the total amount of Micro-Star's gross revenues.

> At the same time, the total amount that consumers paid for Micro-Star descramblers would be substantially less than the amount of cable programming stolen by those consumers.  No consumer would pay, say, $250 for a descrambler unless that consumer planned to steal at least $250 in programming.  Indeed, given the legal risks involved, it is unlikely that a consumer would pay $250 for a descrambler unless he planned to steal a *lot* more than $250 in programming.  Thus, the amount of cable programming stolen by consumers would have far exceeded the amount that consumers paid to retailers for Micro-Star descramblers, and the amount that consumers paid to retailers for Micro-Star descramblers would have far exceeded Micro-Star's gross revenues of $6,435,602.

The district court's reasoning is sound.  Because the infringement amount was almost certainly greater than $6 million, the district court obviously did not clearly err in finding that the infringement amount was no less than $2.5 million.

The results of an alternative calculation confirm that the court's principal estimate of the infringement amount is reasonable.  As we mentioned above, the Government's expert, Brian Richert, estimated the average lost revenue to cable

companies per subscriber from the use of a descrambler for each of the years 1996 through 2001. Special Agent Dean Chappell took the figures for 1999, 2000, and 2001 and multiplied them by the number of descramblers that Micro-Star sold in those years, which yielded an estimated infringement amount of $62,531,621. Even this much larger estimate is extremely conservative, for it assumes that each descrambler would be used only for one year, and it excludes the losses that Micro-Star caused between 1996 and 1998. This alternative calculation of the infringement amount—which, as the district court noted, "is nearly *ten times* the amount of Micro-Star's gross revenue and approximately *twenty-five times* the amount necessary to trigger an 18-point increase in the Sweeneys' base offense level"—reinforces our conclusion that the district court did not clearly err in finding that the infringement amount exceeded $2.5 million. Accordingly, we hold that the district court properly increased the Sweeneys' offense levels by 18 levels.

Mrs. Sweeney appeals the district court's application of a two-level enhancement for manufacturing infringing items. Section 2B5.3(b)(3) directs a sentencing court to increase a defendant's base offense level by 2 levels "if the offense involved the manufacture . . . of infringing items." The relevant application note defines "infringing item" as "the item that violates the copyright or trademark laws." U.S.S.G. § 2B5.3 cmt. n.1. The district court found that the descramblers are infringing items and concluded that Mrs. Sweeney's involvement in manufacturing descramblers made her eligible for the enhancement. Mrs. Sweeney asserts that because descramblers do not themselves violate copyright or trademark laws—at least not in the same way that a "fake Gucci handbag" violates such laws—descramblers cannot be infringing items. Since the descramblers Micro-Star manufactured are not infringing items, the argument runs, Mrs. Sweeney was ineligible for the enhancement. We disagree.

As we noted above, applying section 2B5.3 to the offense of assisting in the unauthorized interception of cable signals requires reasoning by analogy. While the

application notes do not mention the crime the Sweeneys committed, the notes do offer guidance concerning a close analogue; namely, the illegal interception of a satellite transmission in violation of 18 U.S.C. § 2511. *See* U.S.S.G. § 2B5.3 cmt. n.2(A)(iv). The relevant note provides that in cases involving the illegal interception of a satellite transmission, "the 'infringed item' is the satellite transmission rather than the intercepting device." *Id.* Since the same satellite transmission cannot also be the infringing item (*i.e.*, the item that violates the copyright or trademark laws), it stands to reason that the infringing item in this instance is the intercepting device. Thus, two of our sister circuits have found (albeit in unpublished decisions) that satellite access cards that have been modified to permit the unauthorized interception of satellite programming are infringing items. *United States v. Brereton*, 196 Fed. App'x 688, 693 (10th Cir. 2006); *United States v. Mason*, 38 Fed. App'x 458, 459-60 (9th Cir. 2002) (memorandum opinion). In turn, those courts held that modifying satellite access cards to permit the unauthorized interception of satellite programs qualifies as "the manufacture . . . of infringing items" under section 2B5.3(b)(3). *Brereton*, 196 Fed. App'x at 693; *Mason*, 38 Fed. App'x at 459-60.

Interpreting the Guidelines "with a nod towards common sense," *see Brereton*, 196 Fed. App'x at 693, we think the principles that govern cases involving the illegal interception of a satellite transmission apply with equal force in cases involving the unauthorized interception of cable signals. Cable signals, in this context, are analogous to satellite transmissions, so cable signals are the infringed items. And descramblers are analogous to modified satellite access cards (and other types of "intercepting devices"), so descramblers are the infringing items. The evidence showed that Mrs. Sweeney participated in manufacturing descramblers, which means, ipso facto, that she participated in manufacturing infringing items. Accordingly, we hold that the district court correctly applied the two-level enhancement under section 2B5.3(b)(3) for manufacturing infringing items.

Next, Mrs. Sweeney appeals the district court's decision not to reduce her base offense level for being a minimal participant in the conspiracy and in the assisting in unauthorized interception of cable signals. The Sentencing Guidelines direct that "[i]f the defendant was a minimal participant in any criminal activity," the defendant's adjusted offense level should be decreased by four levels. U.S.S.G. § 3B1.2(a). If, however, the defendant's participation was more than minimal but still only minor, then a two-level reduction is appropriate. U.S.S.G. § 3B1.2(b). "The defendant bears the burden of proving a reduction applies." *United States v. Carasa-Vargas*, 420 F.3d 733, 737 (8th Cir. 2005). The district court found that Mrs. Sweeney was a minor participant and reduced her base offense level by two levels. We review for clear error a district court's finding as to a defendant's role in the offense under section 3B1.2. *United States v. Carpenter*, 487 F.3d 623, 625 (8th Cir. 2007).

We have held that a defendant "cannot be considered a minimal participant [where she] had 'knowledge of the scope and structure of the conspiracy and observed the activities of others in the conspiracy.'" *United States v. Whiting*, 522 F.3d 845, 851 (8th Cir. 2008) (quoting *United States v. Denton*, 434 F.3d 1104, 1115 (8th Cir. 2006)). Mrs. Sweeney was involved in the hiring of employees for Micro-Star and at times trained and paid these employees. She also operated the descrambler manufacturing equipment. Kramer testified that Mrs. Sweeney was present on at least one occasion when Kramer was instructing Mr. Sweeney about circuit boards for descramblers. "A defendant's eligibility for a reduction for role in the offense is determined by comparing the defendant's acts to the acts of the other conspirators." *United States v. Boksan*, 293 F.3d 1056, 1058 (8th Cir. 2002). While Mrs. Sweeney was not involved in Micro-Star's operations to the extent that Mr. Sweeney was, she performed many of the same tasks—operating equipment, shipping and billing, and hiring and paying employees—that Mr. Sweeney performed. Given Mrs. Sweeney's familiarity with and involvement in Micro-Star's operations, we find no clear error in the district court's conclusion that Mrs. Sweeney was a minor, but not a minimal, participant in the offense.

Mrs. Sweeney also sought a reduction in her base offense level under the safe harbor provision in U.S.S.G. § 2S1.3(b)(3). This section applies to currency structuring offenses when several conditions are met—including that "the funds were the proceeds of lawful activity," § 2S1.3(b)(3)(C). If the criteria for section 2S1.3(b)(3) are met, the defendant's base offense level should be reduced to 6. The Government argued instead that a 2-level increase was appropriate under section 2S1.3(b)(1) because Mrs. Sweeney "knew or believed the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." The district court rejected both arguments, holding that there was insufficient evidence about the source of the funds involved in the currency structuring offenses to determine whether the funds were the proceeds of lawful or unlawful activity.

As before, "[t]he defendant bears the burden of proving a reduction applies." *Carasa-Vargas*, 420 F.3d at 737; *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir.), *cert. denied*, 558 U.S. ---, 130 S. Ct. 139 (2009). The district court did not clearly err in concluding that there was insufficient evidence regarding the source of the funds used in the currency structuring offenses to support either an enhancement or a reduction. Mrs. Sweeney has provided no evidence to show any legitimate source for the funds involved. Given her failure to satisfy her evidentiary burden, the district court did not clearly err in denying the requested reduction.

## III.   CONCLUSION

For the foregoing reasons, we affirm the Sweeneys' convictions and sentences.

_____